UNITED STATES of America,
Plaintiff–Appellant,

v.

Daniel H. OVERMYER,
Defendant–Appellee.

No. 87–3488.

United States Court of Appeals,
Sixth Circuit.

Argued May 3, 1988.

Decided Feb. 10, 1989.

Rehearing and Rehearing En Banc
Denied March 24, 1989.

James C. Lynch (argued), Asst. U.S. Atty., Cleveland, Ohio, for plaintiff-appellant.

Stanley Arkin, Marc Bogatin (argued), Arkin & Arisohn, New York City, for defendant-appellee.

* The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of

Before KRUPANSKY and NELSON, Circuit Judges, and HACKETT, District Judge.*

HACKETT, District Judge.

The United States appeals from the judgment of the United States District Court, Northern District of Ohio, granting defendant's motion for acquittal under F.R.Crim. P. 29(c). Appellant contends that when the evidence is viewed in the light most favorable to the government, a reasonable jury could have found defendant guilty beyond a reasonable doubt. After a thorough review of the voluminous record in this case, we find that the jury had sufficient evidence to sustain its verdict. We therefore reverse the judgment of the district court and reinstate the jury's verdict.

## PROCEDURAL BACKGROUND

On January 28, 1986, a nine-count indictment was filed against Daniel H. Overmyer and Edmund M. Connery. Overmyer was charged with six counts of bankruptcy fraud, 18 U.S.C. § 152, two counts of conspiracy to commit bankruptcy fraud, 18 U.S.C. § 371, and one count of mail fraud, 18 U.S.C. § 1341. Defendant Connery, charged in six counts of the indictment, was granted a severance.

Prior to submission of the Overmyer case to the jury, the district judge granted defendant Overmyer's motion to dismiss Counts Two, Six, Seven, Eight and Nine pursuant to F.R.Crim.P. 29. The jury returned a verdict of guilty on Count One, filing a false bankruptcy claim on behalf of Hadar International Leasing Co. (Hadar) in the bankruptcy of D.H. Overmyer Telecasting Co., Toledo television station WDHO–TV (Telecasting). The jury acquitted defendant Overmyer on Counts Three, Four and Five. Defendant Overmyer then moved for a judgment of acquittal on Count One pursuant to F.R.Crim.P. 29(c) which the district court granted.

Michigan, sitting by designation.

## FACTUAL BACKGROUND

Daniel H. Overmyer opened his first warehouse in 1947, in Toledo, Ohio, and gradually expanded his operations. By 1973 he was operating public warehouses in 32 states.

In addition to his warehouse operations, Overmyer founded Telecasting in Toledo in 1966. In 1969, he obtained a six-million dollar loan from First National Bank of Boston (FNBB) pledging the stock of Telecasting as collateral.

In 1973, the Overmyer warehouse companies entered Chapter 11 in New York. In 1976, Telecasting filed a petition under Chapter 11 in New York. This proceeding was dismissed in 1980 and appealed by Overmyer. The appeal was denied and, on the same day, Telecasting refiled under Chapter 11 in Cleveland, Ohio. On March 28, 1981, the Cleveland bankruptcy court awarded control of Telecasting to FNBB.

On August 7, 1981, the Overmyer leasing company, operating as Hadar, which also was in Chapter 11, filed a proof of claim for $859,481.80 in the Telecasting bankruptcy proceedings. It is this proof of claim that resulted in Overmyer's indictment.

The proof of claim allegedly was based upon various television broadcast equipment leases between Hadar and Telecasting. A lease agreement for certain equipment was executed in January, 1981, although Overmyer contends that the price and other specific terms were not agreed upon until a later date. Pursuant to this lease agreement, monthly lease payments of $50,000 were not due until the leased equipment was installed. Telecasting was to cover installation costs. The proof of claim filed by Hadar on August 7, 1981, in the amount of $859,481.80 allegedly included lease payments, a $400,000 deposit and $249,116.18 installation costs of the leased equipment.

In its case-in-chief on Count One of the indictment, the government argued that the proof of claim filed by Hadar in the Telecasting bankruptcy was false in three respects and that Overmyer knew it was a false claim:

First, the sum contained a charge of $50,-000 per month beginning in January, 1981, for lease payments on equipment not yet installed.

Two, the sum contained a charge in the amount of $249,116.18 for installation charges for new equipment not installed as of February 6th, 1981.

And third, as of February 6, 1981, Telecasting had overpaid Hadar for any leasing obligations it might have had.

## THE TEST FOR REVIEWING A RULE 29(c) MOTION

It is well settled that the test to be applied by a trial court in determining a defendant's motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is taking the evidence and inferences most favorably to the government, if there is such evidence therefrom to conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is for the jury. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1940); *York v. Tate*, 858 F.2d 322 (6th Cir.1988); *United States v. Conti*, 339 F.2d 10 (6th Cir.1964). The Supreme Court has observed that the granting of a motion of acquittal, "... will be confined to cases where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). *See, Blalack v. United States*, 154 F.2d 591 (6th Cir.), *cert. denied*, 329 U.S. 738, 67 S.Ct. 67, 91 L.Ed. 637 (1946).

An appellate court, in reviewing a trial court's decision regarding a Rule 29 motion, applies the same principles to the record it has before it. *United States v. Gibson*, 675 F.2d 825 (6th Cir.1982). Other circuits have indicated the use of the same test following the trial court's reversal of a guilty verdict pursuant to Rule 29(c). *United States v. Martinez*, 763 F.2d 1297 (11th Cir.1985); *United States v. Hazeem*, 679 F.2d 770 (9th Cir.1982); *United States v. Brandon*, 633 F.2d 773 (9th Cir.1980); *United States v. Beck*, 615 F.2d 441 (7th

Cir.1980); *United States v. Varkonyi,* 611 F.2d 84 (5th Cir.1980); *United States v. Dreitzler,* 577 F.2d 539 (9th Cir.1978).

The 11th Circuit in the *Martinez* case, *supra,* stated the test for review of a verdict overturned by a judgment of acquittal as follows:

> On a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the verdict and, under that light, determine whether the evidence is sufficient to support the verdict. Thus, on this motion, the court assumes the truth of the evidence offered by the prosecution. (Citation omitted).

*United States v. Martinez, supra* at 1312.

The filing of a false bankruptcy claim is prohibited by 18 U.S.C. § 152 which provides, in pertinent part:

> Whoever knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, personally, or by agent, proxy, or attorney, or as agent, proxy, or attorney, ... shall be fined not more than $5,000 or imprisoned not more than five years, or both.

## THE EVIDENCE BEFORE THE JURY

The jury trial in this matter commenced on October 15, 1986, and continued through November 18, 1986. In support of its allegations, the government introduced the following evidence.

David Raible was associated with Overmyer from 1975 to at least 1983. At various times he also served in the following capacities: on the board and as an officer of Telecasting and an officer and executive vice-president of Hadar; president of Intermodal Systems Leasing, Inc. (ISLI); president of Jeebs Distribution Services (Jeebs) beginning in late 1975 or early 1976; president and an officer of National Distribution Services (NDS) beginning approximately October, 1977; an officer of Jeebs Marketing and Management beginning approximately October, 1977; director and secretary of the corporation of R.T. Systems, Inc. and two of its subsidiaries known as Freight Delivery Service of Florida and TOFC Terminals, Inc.; an officer of Omega Executive Services, Inc.; an officer of AGG Projects, Inc. (AGG); and, an officer of Morton Telecasting. The headquarters for most of these corporations was located at Three Park Avenue in New York. Raible was appointed to all of these positions by Overmyer and received daily supervision by Overmyer. Overmyer was his boss.

Raible testified that Overmyer appointed all of Hadar's officers and that even when Overmyer's son-in-law Stuart Strang, who had been employed pumping gas at a gas station prior to being appointed president of Hadar, was appointed president in 1978 or 1979, Raible continued to report to Overmyer and not to Strang. When asked if Overmyer had any position with Hadar, Raible responded "well not if you will read the corporate structure that was established," although some documents listed Overmyer as a consultant.

Raible testified that it was Overmyer who determined the $16,067.37 monthly figure on lease ML–2, Overmyer who instructed Raible which of Hadar's bills to pay, Overmyer who gave daily instructions regarding the disposition of Hadar's cash and Overmyer who gave instructions to all of the employees at Three Park Avenue. Further, it was Overmyer and not Raible who received the daily reports of Hadar's cash balances and bank accounts.

Regarding the lease of equipment between Telecasting and Hadar, Raible testified that the "Overmyer Formula" was established sometime in 1978, or possibly earlier. Raible stated that the formula developed over a period of time. At one time leases were prepared and later changed as a new formula developed. It was not until late 1977 or early 1978 that a pattern was firmly established and thereafter continued.

Raible assisted Overmyer in developing the formula. Overmyer would come to Raible and ask Raible to calculate figures based on various percentages to see what the total figure would come to based on calculations at different rates. Overmyer

would then make a decision as to which particular calculation would be used.

The "Overmyer Formula" took the total sales price of the equipment being acquired and added to it 20% for each year the lease would be in existence. State sales tax of 4½% was charged on that figure. Twenty-percent of that total amount was required as a deposit, plus a two-percent commitment fee. The balance was divided as monthly payments and the monthly payment had sales tax added to it. Raible testified that it was Overmyer who decided to use this formula. A 20% deposit was not required prior to institution of the "Overmyer Formula," but when the formula was instituted the leases then in existence were recalculated, revised and redone for prior periods at Overmyer's direction.

Raible testified that from 1977 to 1983 he had innumerable discussions with Overmyer regarding the balance owing between Hadar and Telecasting. Raible stated that Overmyer told him "that the leases needed to be increased in their value because additional monies needed to be accounted for that had been transferred from Telecasting to Hadar. And discussions ensued with regard to how to calculate and recalculate or move more equipment or additional equipment into the station to procure and generate more lease revenue for Hadar leasing to account for monies already taken from the station."

Raible explained that he sent government exhibit 147, dated April 6, 1978, to Telecasting per Overmyer's instruction, which exhibit was a letter from Raible to Telecasting changing the leases then in effect from long-term leases to month-to-month leases and raising the monthly rental by $4,200, effective as of February 1, 1977. Raible was then instructed to prepare invoices to reflect the additional monthly charge and to re-do the invoices which previously had been submitted to Telecasting.

Overmyer advised Raible that "a company in bankruptcy such as Telecasting could not expect to get a long-term lease from anyone and Hadar was not going to give them anything more than they would get

from anyone else; and it necessitated a short-term month-to-month lease because that was all they could sustain through a Chapter 11 proceeding." Regarding the $4,200 increase, Overmyer told Raible that $4,200 multiplied by whatever months were involved would produce additional revenue for Hadar and that Hadar needed to cover monies that had already been paid by Telecasting to Hadar.

Raible testified that three equipment packages were obtained from One Hundred East Corporation. The first was obtained pursuant to a contract dated September 10, 1979, referred to by the parties as the American Data Systems package (H–1043). With regard to this package, Raible testified that Overmyer did not have any discussions with Walter Corcoran, president of One Hundred East Credit Corporation, the financing affiliate of North American Phillips Corp. (Phillips) since March 1, 1976, although Raible frequently discussed the package with Overmyer and had received instructions from Overmyer regarding these negotiations and that Hadar should be the acquiring company. The second package (H–1044) involved a new antenna and new transmitter. Overmyer did discuss the second package with Corcoran at Corcoran's suggestion that it would be beneficial if he got together with Overmyer to discuss with him the status of his various corporations. As part of these discussions, Corcoran requested and received financial statements of Telecasting. The third package (H–1045) was for the additional equipment needed by Telecasting to improve the quality of the station.

All three equipment packages were reduced to writing in the form of leases between Hadar and Telecasting. Raible testified that it was Overmyer who determined that a 20% deposit would be required on the lease. Leases H–1044 and H–1045 provided for monthly payments of $50,-492.88 to Hadar from Telecasting. This amount was determined by charging 160% of the total package divided by 96 months. It was Overmyer who determined this amount. In addition to government exhibit 101 (lease H–1044), bearing monthly pay-

ments of $50,492.88, the government introduced its exhibit 102 (another lease H–1044) which covered the same transmitter and antenna equipment but required monthly payments of no less than $31,557.53. This second lease had been executed at the request of Corcoran who required the lease between Hadar and Telecasting to be in the amount of Hadar's payments to One Hundred East Corporation. This lease was then assigned to One Hundred East Corporation.

Raible explained the procedure for invoicing Telecasting. Raible's secretary would type the invoices monthly and deliver the typed invoices to William Chi, an officer of Telecasting whose office also was at Three Park Avenue.

In late 1980 to early 1981, Raible was given a specific dollar amount needed to cover, and was told to contact William T. Shock, president of Telecasting, to calculate all of the costs necessary to complete equipment installation. *Overmyer told Raible that a substantial proof of claim needed to be filed by Hadar in the Telecasting bankruptcy proceeding in order to support funds that had been removed from Telecasting.* Raible obtained the information from Shock and delivered it to attorney Edmund M. Connery (Connery). Raible testified that a letter was circulated to advise Telecasting of these costs and that he signed this letter at Overmyer's direction.

Raible explained that a $44,000 figure for Hood Electric was the subject of a lease other than H–1043, H–1044 or H–1045 and was in fact billed April 7, 1978. Regarding a letter dated February 3, 1981, attached to the proof of claim, Raible testified that it was not actually sent on that date, but instead at a later time. He testified that he accepted the One Hundred East Corporation equipment on behalf of Hadar pursuant to Overmyer's instructions. Raible stated that he was not aware of a $400,000 deposit being made by Telecasting to Hadar, but recalled discussing this figure with Overmyer sometime prior to filing the claim in the Telecasting bankruptcy. *Overmyer told Raible that the $400,000 figure was to represent a deposit for the One Hundred East Corporation items and that it was needed to cover previous cash withdrawals from the television station.* Raible was aware that Telecasting had overpaid Hadar with respect to the leases and stated that the $400,000 was not the result of arms-length negotiations on Hadar's behalf with Overmyer.

Raible signed the proof of claim in Connery's office at Three Park Avenue at Overmyer's instructions. Raible did not prepare the schedule attached to the proof of claim, but he may have delivered documents used in preparation of that schedule.

Raible also testified regarding Telecasting's board of directors resolution dated January 5, 1981, calling for monthly rental of $50,000 for the One Hundred East Corporation equipment, effective January 1, 1981. This resolution was signed by Overmyer, Shirley C. Overmyer, Raible and William Chi. Raible testified that this resolution was actually executed subsequent to January 5, 1981. Raible testified that contracts were signed between Hadar and Telecasting regarding H–1044 and H–1045 with several figures, but ultimately the $50,000 figure was used. This figure did not comport with the "Overmyer Formula" which would have required a deposit of $960,000 and monthly payments of approximately $96,000. Overmyer, however, chose the $50,000 figure himself because the formula figures were excessive.

Regarding the installation figures included in the proof of claim, Raible testified that in some instances those were based on incurred charges, but in other cases were based solely on bids.

Howard L. Klein, an accountant, testified that he was assigned to examine the books and records of Telecasting in approximately April of 1981, by his employer Ernst and Whinney at the request of FNBB. He was told by his employer that he would spend approximately twenty to forty hours helping to coordinate efforts of Ernst and Whinney's auditors of Telecasting's books in Toledo and the lawyers representing Telecasting in Cleveland. Instead, between

April, 1981, and the date of Overmyer's trial, Klein spent between 2,500 and 3,000 hours examining Telecasting's books and records. In his review, Klein examined Telecasting's financial statements, general ledgers, cancelled checks, checkbooks, invoices, deposit slips, correspondence files and legal files. Klein stated that a "reasonable" set of records was available for the periods 1977 through 1980, although there were periods of time lacking records, and very few records existed for the period before August, 1976.

When assigned to Telecasting, Klein was given a list of objectives. The first was to establish accounting controls within the station in order to review what kinds of controls were present and to ensure that proper reporting could be performed by the employees. The second objective was to provide monthly financial statements to the bankruptcy court and to review the company's procedures in the preparation of financial statements. Other objectives included preparing a list of assets and liabilities as of February 6, 1981, the date Telecasting filed bankruptcy in Ohio, and to analyze the bankruptcy schedules previously filed by Telecasting and, if necessary, amend them to reflect all inter-company transfers and all leases. In analyzing the leases, Klein also used the books and records of Hadar. Most of the books and records used by Klein were located at Three Park Avenue in New York City.

The leases which Klein examined that were in existence at the time of Telecasting's Cleveland bankruptcy were numbered beginning from H–1001 through H–1050, except for some gaps of approximately eight or nine leases. Some of the leases were identical to leases entered into between Telecasting and ISLI, the former lessor of equipment to Telecasting. When the ISLI leases expired, the assets of ISLI were transferred to D.H. Overmyer Trucking, Inc. (Trucking). Telecasting then entered into new leases for the same equipment with Trucking. ISLI's books show that its assets were purchased at a cost of $466,000, although this amount was never actually paid. Trucking later assumed the name of Hadar.

Klein also testified that many of the original ISLI leases contained options to purchase for nominal amounts such as $1 at the completion of the lease. However, at the expiration of the leases, rather than exercising the options, Telecasting entered into new, longer term leases at increased rates for the same equipment. For example, Telecasting had thirty equipment leases with ISLI which were consolidated into one lease (H–1002) when entered into with Hadar. Hadar invoiced Telecasting $16,067.37 plus 4½% sales tax a month for these leases, although Trucking had invoiced Telecasting only $12,277. Klein also calculated what the monthly lease payment would be if the original leases had been renewed and the options exercised when due, and came up with a monthly rental of $8,662.85.

Klein testified as to the existence of a formula that was used to compute the terms of the leases between Hadar and Telecasting which he referred to as the "Overmyer Formula." Under that formula, Hadar would take the total cost of the equipment it purchased and determine the number of years that it would lease it to Telecasting. For each year the equipment would be leased, 20% was added to determine the lease obligations. For example, a one-year lease would be 1.2 times the original cost; a two-year lease 1.4 times the original cost; a three-year lease, the most common lease period according to Klein, 1.6 times the original cost, etc. Once the total lease dollar figure was obtained, Hadar would calculate 20% which would be charged as a deposit. The remainder was spread over the life of the lease.

Klein also testified regarding the financial transactions between Telecasting and Hadar. For the period from January, 1976, through March, 1981, Telecasting made payments to Hadar, or on behalf of Hadar to third parties, totaling $3,011,909. Klein testified that from 1976 through April of 1978, payments made to Hadar matched invoices. However, after April, 1978, the checks issued to Hadar did not match the invoices to Telecasting, but exceeded or preceded the invoices.

Klein testified that for the period January, 1976, through March, 1981, the total cash received by Hadar from all sources was $3,075,000. Of that, $2,804,000 was received from Telecasting, $254,000 came from other companies using Three Park Avenue as their designated home office, and $17,000 came from miscellaneous sources.

Klein also examined Hadar's disbursements. The amount of $2,297,000 was disbursed to Three Park Avenue companies: $497,000 was paid to vendors on leases to Telecasting, $36,000 for property leases or payments made on behalf of Telecasting for which no lease was written, $73,000 to One Hundred East Corporation as payment on leases H–1044 and H–1045 (the transmitter equipment) and $172,000 in miscellaneous disbursements. Klein testified that although Hadar charged sales tax on its leases to Telecasting, no disbursements were made by Hadar for state sales taxes.

Klein further testified as to the existence of other Three Park Avenue companies. AGG is a company that had agreements with both Hadar and Telecasting for personnel and accounting services. Overmyer had the ultimate or final responsibility for the control, direction and the disbursement of funds of AGG. Other Three Park Avenue companies included Peerless, NDS, Jeebs and Weathervane Farms.

Klein was able to identify $743,573.44 worth of checks for the period July 11, 1977, through March, 1981, that were written by Telecasting to Hadar. The same day, or the next day, a check in the exact amount was written by Hadar to AGG. Klein also testified that he found $78,084.75 worth of checks written by Telecasting to Hadar for which Hadar, in turn, wrote identical amounts to Peerless.

Klein prepared a schedule beginning January 1, 1976, of the transactions between Hadar and Telecasting. Klein testified

that according to his calculations, as of January 1, 1976, Hadar had overpaid Telecasting by $8,000. However, because he considered this amount insignificant, he began his statement with a zero balance. Klein calculated that as of August 31, 1976, Telecasting had paid Hadar $83,000 in excess of invoices. For the following fiscal year of August 31, 1976, to August 31, 1977, Telecasting overpaid Hadar invoices by $174,000, leaving a cumulative overpayment of $258,000.[1] Through August 31, 1978, Hadar actually invoiced Telecasting $49,000 more than Telecasting's payments, so the overpayment was reduced to $208,000. During the fiscal years ending August 31, 1979, and August 31, 1980, Telecasting overpaid Hadar $165,000 and $101,000, respectively, raising the cumulative overpayment to $473,000 for 1979 and $575,000 for 1980.[2] For the period September 1, 1980, to October 31, 1981, Telecasting invoiced Hadar for $67,000 more than it paid, which decreased the overpayment to $507,793.72.[3] The total payments made to Hadar from January, 1976, through January 31, 1981, were $3,191,909.01. The total disbursements made by Hadar were as follows: $496,683.04 to vendors directly relating to property leased to Telecasting, $36,137.21 to vendors for which no leases were written, $73,048.74 to One Hundred East Corporation on leases H–1044 and H–1045 and $65,800 which Hadar paid to Telecasting.

On cross-examination, Klein testified that although there is nothing wrong with one entity owning several companies, other than the Overmyer related companies, he had never heard of a company that had leasing subsidiaries which only leased to related or affiliated companies.

Regarding the leases with One Hundred East Corporation, Klein testified that the lease for equipment between Hadar and One Hundred East Corporation commenced

---

1. As with all others, these figures were reproduced from the record. Our calculation of the excess amounts paid to Hadar for those fiscal years equal a cumulative overpayment of $257,000.

2. Again, our calculation of the cumulative overpayments for 1979 and 1980 differ from the record. For 1979, we calculated the overpayment at $373,000 and for 1980 at $474,000.

3. According to our calculations, the $67,000 invoice decreased the overpayment to $407,000.

the first day of the first month after commencement date. Commencement date was defined as the date of written acceptance of collateral or first use, whichever was earliest. One Hundred East Corporation began invoicing Hadar in January, 1981.

Peter Fox, another Telecasting employee, testified that he met with Raible and Overmyer on December 16, 1975, and was instructed by Overmyer to get the good contracts out of ISLI and into Trucking by use of simple assignment promissory notes as the consideration. Fox also met with Overmyer on January 13, 1976, concerning Telecasting's New York bankruptcy. Overmyer told Fox that according to Sidney Levy, a bankruptcy attorney, Telecasting's Chapter 11 must be ready to file on one-hour's notice because there was danger of a receiver being appointed for Telecasting.

On January 19, 1976, Overmyer told Fox to make ISLI's transfers to Trucking retroactive to December 8, 1975.

At a meeting on April 12, 1976, attended by Overmyer, Raible and Fox, Overmyer stated that certain things needed to be done according to Irv Echtman, a bankruptcy attorney who was advising Overmyer: send notice to Arthur Dorfner, president of Telecasting at that time, that the notes regarding the ISLI–Trucking transfer should be dated December 8, 1975; assign ISLI possession as lessee to Trucking as of December 8, 1975; leases should be of short duration; and see that leases in fact are not competitive.

At this same meeting, a concern was raised that in previous testimony concerning where he leased equipment, Dorfner may have said something other than Trucking. Overmyer replied that he had a transcript of the testimony. Overmyer also expressed concern over the high rate of lease payments charged to Telecasting. He stated that they wanted to be very careful because of the FNBB.

Fox testified about another meeting that took place on April 22, 1976, including himself, Raible and Overmyer. Overmyer discussed firing Dorfner. Overmyer was afraid that Dorfner was in league with the

banks because Dorfner paid trade bills instead of the attorneys. Dorfner was told to pay according to Overmyer's instructions and not to substitute his judgment. Overmyer spoke with Dorfner about the situation, but did not fire him. According to Fox, Overmyer told Dorfner "I'm willing to put my signature to anything. All I want you to do is to do what I tell you to do and let me control the cash. You could bring the whole ship down." Overmyer also indicated that Telecasting might be placed in Chapter 11 to keep control of it away from FNBB. Telecasting subsequently filed under Chapter 11 on August 10, 1976.

Dorfner testified that WDHO–TV, Telecasting's television station, became operational in May, 1966. At that time, he was executive vice-president of Telecasting. In 1968, he was elected president of Telecasting and became a member of the board of directors. Dorfner stated that the board elected him president, but that the board was obviously directed by Overmyer who was the sole shareholder of Telecasting and chairman of the board. Dorfner testified that in his position at Telecasting, he was the chief administrative officer and general manager of operations, although he worked under Overmyer's supervision. Dorfner testified that Overmyer was always directly interested and was the principal point of report at Telecasting. However, in the years prior to 1976, Overmyer did not get involved in the day-to-day functions of the station.

Dorfner also testified that Overmyer's policy, which was made clear at the outset, was that Telecasting would own no hard assets, but would lease them from an affiliated company. Prior to 1975, Dorfner and the engineers would negotiate lease terms with suppliers. The leasing entity would then lease the equipment from the supplier and lease the equipment to Telecasting at a one-percent mark-up over what the supplier had charged. There was an understanding that after the lease had been completed, the station would be able to buy the equipment for one dollar or some nominal amount. Dorfner further testified that

shortly after he was hired, WDHO–TV became profitable and continued to be profitable.

According to Dorfner, most financial documents were moved from Ohio to New York in 1976. All payables over $25 had to be paid by New York and all payments were directed to New York. At that point, bills began to be paid late and eventually the New York Chapter 11 proceeding was filed to prevent a receiver from being appointed by the FNBB. Overmyer was appointed vice-president of finance and debtor in possession of Telecasting.

Regarding the service contracts, Dorfner stated that they were entered into with Jeebs and AGG. The monthly rate was $1,500, but later was raised by the board of directors to $2,500, over his objection. Thereafter, Dorfner was removed from the board of directors. In June, 1979, the amount was raised to $5,000 per month.

Jeebs and AGG were associated with Overmyer. Dorfner was not aware of any services actually performed by Jeebs or AGG. The contract with AGG for $5,000 per month was presented to Dorfner for his signature in June, 1979, by Raible, William Chi and Connery. At first, Dorfner refused to sign the contract and spoke with Overmyer regarding the agreement. Overmyer told Dorfner that the board had approved it and that Dorfner was to sign the contract before Overmyer left for New York. After discussing the service agreement with Connery, Dorfner signed the agreement.

James Bowe was employed at WDHO–TV as a staff engineer in 1969, and continued in that position until September 15, 1980, when he was made chief engineer. He was later promoted to operations manager and in February of 1981, vice-president of engineering. Bowe first explained the equipment need for the operation of a television station such as WDHO–TV. The foremost piece of equipment is a transmitter which takes the audio and video signal and transmits it through the air so it can be received by a receiving antenna and then again made into pictures and sound. Microwave equipment is then needed to get the signal from the studio to the transmitter. An antenna radiates the signal. Within the studio, audio and video equipment, such as cameras, tape machines, microphones and film projectors, is needed.

Prior to 1968, through at least 1980, WDHO–TV used a GE 30–kilowatt–hour output transmitter. At that time, WDHO–TV was in the process of obtaining a new transmitter supplied by Phillips. One Hundred East Corporation is the financing entity of Phillips.

In July of 1980, Bowe went to England with the former chief engineer to inspect the transmitter. Bowe testified that it was his job to see that the transmitter was installed and put on the air and explained the procedure for installing a transmitter. When the transmitter is obtained, it is crated. It must be taken out of the crates, assembled, tested as a single unit, torn down and then shipped to WDHO–TV from England. Many electrical changes were required in the building in which the transmitter was to be housed because it required different power than the old transmitter. Duct work had to be installed and plumbing completed for the vapor-cooled system. Further, "inside plumbing," which is the copper coaxial tubes that take the signal out of the transmitter and to the antenna, was needed.

Bowe testified that as of February 3, 1981, the antenna had been installed and 80% of the transmitter itself (the outside shell) had been assembled. Neither the outside plumbing, the electrical work nor the water or vapor cooling systems had been completed.

Bowe testified that the electrical work on the transmitter was completed by Slates Electric Company (Slates) in April, 1983. As of the end of 1980, Slates had not begun any work on the electrical connection of the transmitter, although some of the layout work had been done, some conduit installed and possibly some switching boxes. Slates stopped work in 1980 and did not resume work until the Fall of 1981.

William Shock was station manager of WDHO–TV in May of 1980, and was responsible for the entire operation of the

station. Shock testified that he reported to Overmyer virtually daily. On February 6, 1981, in a five minute conversation with Overmyer, Shock was told that the appeal of the Chapter 11 proceeding in New York had been dismissed, a new petition had been filed in Cleveland and that Shock had been made president.

It was Shock who signed the Statement of Affairs of Telecasting that was filed with the bankruptcy court on March 10, 1981. Both Connery and Overmyer were present when Shock signed it. Shock asked if the information contained in the Statement was accurate and was led to believe that it was, although he could not recall whether it was Overmyer or Connery who instructed him to sign it.

When asked if, at the time he signed the Statement of Affairs, he had any knowledge concerning the truth or accuracy of the $400,000 deposit with Hadar, Shock answered that he did not.

Shock testified that WDHO–TV received the Phillips transmitter in August, 1980, and that Slates began installation in Fall, 1980, but soon pulled off the job because they were not being paid. No additional work was performed in 1980 or 1981. Shock stated that as of February, 1981, the transmitter was "sitting there totally inoperational."

In early 1981, prior to the Cleveland Chapter 11, Overmyer contacted Shock by telephone "to get a handle on the installation costs which could be associated with the transmitter and any other things that he might see upcoming that were even remotely associated with total installation costs." Shock was instructed to give these figures to Raible. He supplied Raible with the information within days. In May, 1981, Shock received a letter from Raible as president of Hadar dated February 3, 1981, which preceded the February 6, 1981, Chapter 11 in Cleveland that stated:

Dear Bill,

Installation expenses incurred by this Company on your behalf as of January 31, 1981, for the new antenna, transmitter and satellite communications systems on lease to you, effective as of January 1, 1981, are set forth below.

All such expenses were incurred upon the specific request and approval of your staff.

Please consider this as our invoice to you for such charges.

The total invoice amount was $249,116.18. This letter/invoice was attached to Hadar's proof of claim filed in the Telecasting bankruptcy to substantiate its claim. However, Shock testified that no satellite communication system had been received, and that Shock was not aware of any approval of these expenses having been given.

Shock also testified regarding the specific amount in the February 3, 1981, letter. He testified that the Products Analysis Structural Testing figure included work done on the transmitter, but also included painting a transmitter building and some structural changes to a transmitter building. All of this work had been completed, although it did not all relate to the transmitter installation. Big B Fence was not completed, Milo Bros. was completed, the charge for George Kountopes was for the painting of a studio tower which had been done in the summer of 1980 and was related to the transmitter. The two Auburndale truck charges related to the transmitter, as did the charges for Stainless and Slates, although the Slates work was not completed. Shock testified that the Hood Electrical charges were totally unrelated to the installation of the transmitter, antenna or satellite systems installation, although it was for installation of generators at the transmitter site.

Regarding the twelve items listed February 3, 1981, which accounted for $106,904.14 under "installation in progress," Shock testified that no work had been completed or even started on any of these items, although bids in these amounts may have been received.

The government read into the record the deposition testimony of Overmyer taken on December 2, 1980, in relation to the bankruptcy proceedings. In his deposition, Overmyer stated that he got into the leasing business in the 1950's by leasing trucks

and automobiles to warehouse companies which he either owned or controlled. However, sometime in 1975 the leases were transferred to Hadar. At first Overmyer denied the existence of any relationship with Hadar, but admitted that he and his wife leased automobiles from Hadar and that he was at one time president of Trucking. When asked if he could explain how that was relevant to his relationship with Hadar, Overmyer answered "no." Overmyer denied knowing any employees of Hadar or knowing if Raible was employed by Hadar. Overmyer stated that Raible may have been employed by Hadar at some time, possibly as vice-president.

The government also introduced testimony given under oath at the initial meeting of the creditors of Telecasting on March 19, 1981. At that meeting Overmyer was asked to explain the $400,000 with Hadar. Overmyer stated that "it represents eight monthly payments of $50,000 on an aggregate lease which was originally executed in 1979 for equipment financed by [One] Hundred East Credit Corporation which provided for the station a new antenna. The existing antenna was not giving you the right kind of picture.... The aggregate net cost was approximately ... $200,000 and the finance cost was a little over I think $3,100,000, something like that. It was a deposit on that." When asked if the contract had been performed yet, Overmyer stated "yes, it has. All of the equipment is in place and operational with the exception of the transmitter which should be operational within another month or two."

Overmyer was asked if the $400,000 would still be considered a deposit since the equipment was in place. Overmyer responded that he still considered the money a deposit or pre-paid rent "because it was paid for the purpose of procuring a very favorable lease to the station."

Overmyer further testified that because of FNBB's attempts to have a receiver appointed in 1974 or 1975 "it was impossible to finance equipment through the station" so Telecasting was forced to utilize a leasing entity to equip the station. Over-

myer stated that originally this entity was ISLI, but in 1975 Hadar purchased the leases from ISLI. When asked if he owned Hadar, Overmyer stated that it was a company owned and trusted to his children so he would presume it was controlled by him. He was not exactly sure of Hadar's officers, but knew that Raible, Stuart Strang (his son-in-law) and his daughter were officers. He also stated he did not know who sat on Hadar's board of directors.

Overmyer acknowledged that Telecasting had filed no federal tax return since the mid–70's.

Regarding the transmitter equipment, Overmyer testified that he thought Hadar's payments to One Hundred East Corporation were about $40,000 and that Telecasting's payments to Hadar were $50,000. He also stated that he knew that Hadar was required to pay One Hundred East Corporation a deposit, but he did not know how much.

Overmyer testified that if he had a question about how much money was owed he would ask Raible, who was the principal operating officer of Hadar. Raible was in fact also a director of Telecasting.

Overmyer explained that part of his duties at Telecasting was to negotiate favorable leases with Hadar. Overmyer also testified that Telecasting unsuccessfully attempted to obtain financing on its own and that Hadar was the only place from which it was able to lease. Overmyer stated that he negotiated the equipment leases on behalf of Telecasting with Raible on behalf of Hadar. He claimed that the $50,000 a month figure was a compromise obtained as a result of negotiations. Overmyer could not recall if he entered into a resolution to contract with Hadar.

Corcoran testified that his company provided financing on equipment to be used at Telecasting, but made the financial arrangements with Hadar. He stated that he attended a National Association of Broadcasters convention in April, 1979, and was told by one of Phillips' sales representatives that there was a Toledo station interested in purchasing some equipment. In May or June, he talked with Raible to dis-

cuss possible financing of that equipment. It was at that time when he first learned that the financing agreement would not be directly with the station, but with Hadar.

A contract was executed by Hadar on September 10, 1974 and by Corcoran and One Hundred East Corporation on January 22, 1980. The contract required one month's rental ($31,557.13) from Hadar. One Hundred East Corporation also required the lease between Hadar and Telecasting to require monthly payments of not less than the amount charged by it to Hadar. One Hundred East Corporation further required that the lease between Hadar and Telecasting be assigned to it as additional security. A copy of this lease signed by Raible, William Chi and Overmyer was provided.

Corcoran testified that he first met Overmyer in the fall of 1979 to discuss the possibility of One Hundred East Corporation providing financing to Hadar and thereafter met with him several times. At these meetings, a number of topics were discussed, including identifying the Overmyer companies and the fact that the warehouse company and television station were both in bankruptcy. They also discussed the state of the television market in Toledo and the relationship between Telecasting and its creditors such as the FNBB.

Corcoran also testified that as to the lease for the American Data Switcher (H-1043), they did receive seven or eight monthly payments, but that on the second contract, a contract for over a million dollars, no payment was received other than the security deposit. Nor did One Hundred East Corporation receive any payments on the $500,000 equipment for the electronic news gathering van and the work on the tower, although they did receive an unallocated payment for $10,000 or $12,000 in early 1981. Payments were due to commence on these contracts on the first day of the month closest to when they received a signed acceptance certificate from Hadar. With the second and third contracts, this was received in the first week of January, 1981.

E. Thomas Meisner was employed as an accountant by Telecasting in Toledo beginning approximately in February of 1979. He began as the business manager and advanced to vice-president and comptroller. Meisner has a degree from Youngstown State University with a background in accounting. He was not a certified public accountant. As business affairs manager, Meisner's duties included billing, accounts receivables and processing accounts payable. When Meisner began his employment, Telecasting's books and records were located in New York at Three Park Avenue. Meisner's job was to process invoices for payment from New York. He had an accounts payable supervisor under him that processed the billing. Meisner and Dorfner's signatures were required and the bills were then forwarded to New York. If cash was received for invoices in Toledo, it was air expressed to New York the same day. Meisner was given instructions by William Chi who was then comptroller of Telecasting. In August, 1979, Telecasting's books and records were returned to Toledo, at which point the accounting records were brought up to date and financial statements prepared. However, payment of bills was still done out of New York.

Meisner met with Overmyer and Ron Steiner in approximately mid-to-late 1980 at the Toledo office to discuss getting cash allotted to pay local bills. Overmyer approved a sum to pay local bills.

Part of Meisner's job also included reconciling bank statements with Telecasting's records, but he was unable to do so because many checks were held and many deposits were untrackable.

Meisner would receive monthly a list from New York on amounts paid to Hadar to be posted to the accounting records. Meisner maintained an account reflecting the balance of payments or amounts due and owing between Telecasting and Hadar. The account was numbered 0310.

Meisner terminated his employment with Telecasting on February 27, 1981, but was contacted at his home by Overmyer on Saturday, February 28, 1981, to make cer-

tain entries. On February 28, 1981, Meisner posted $626,003.47 to account 0310 as a credit entry to the Hadar account per instructions from Shock. Shock had received instructions by letter from Connery to make these entries. Connery's letter stated, in part: "eliminate other deferred assets by a debit to deposit on new equipment leases of $234,138 and debit to other receivables $31,865, and then T.V. [Telecasting] is obligated to Hadar for equipment installation costs incurred by Hadar." This entry took $626,003.47, which was a debit account to Hadar, transferred it to a credit account, and then to 0408, an equipment lease account. The amount of $391,000 went into another equipment account. Prior to this entry, the books showed that Hadar owed Telecasting $626,003.47.

Meisner later was asked by Connery to make another entry debiting the equipment leases and crediting receivables by increasing the deposit on One Hundred East Corporation to eight months rent at $50,000 per month, rather than six months at $39,390.52 per month.

Michael Carrieri was an employee of Hadar who reported to Raible. His duties included the preparation of a dated accounts payable listing and a listing of leases to be billed to Telecasting. He also prepared requests for payments and the checks resulting from those requests.

Carrieri testified that he believed that Stuart Strang was president of Hadar while Carrieri was employed there, although the only activity he ever saw Strang perform was the signing of checks. Carrieri thought Raible was an executive vice-president and functioned in all capacities in which Hadar was involved. When asked what activities Hadar was involved in, Carrieri testified that it leased equipment to Telecasting and owed payables to the people who leased the items to Hadar. Carrieri testified that Hadar had no other employees and no payroll.

After Carrieri prepared a listing of payables he would take it to Raible who, in turn, took the list to Overmyer. It would later be returned to Carrieri with instructions.

Peter Lynch, an accountant with Hadar, testified that according to the general ledger he prepared in 1981, which was based on documents given to him by Connery, Hadar had a credit of $376,835.04 on its books owed to Telecasting as of September 1, 1979.

## JURY INSTRUCTIONS

The District Court instructed the jury as follows:

\* \* \* \* \* \*

To warrant your finding the defendant guilty as to Count 1, you must find that the [government/United States] has proven beyond a reasonable doubt each of the following essential elements of the crime charged.

First, that the bankruptcy proceedings of D.H. Overmyer Telecasting had been commenced.

Second, that Mr. Overmyer presented or willfully caused to be presented a proof of claim on behalf of Hadar in the Telecasting bankruptcy.

Third, that the proof of claim was false as to a material matter. And fourth, that the defendant knew the proof of claim was false and acted knowingly and fraudulently.

The gist of the offense, then, is not the validity of the leases or whether they were prudent business-wise. Rather, it is whether a false claim was filed.

\* \* \* \* \* \*

As to the first element there is no dispute concerning the fact that the bankruptcy proceedings of D.H. Overmyer Telecasting had been commenced at the time the Hadar proof of claim was filed. Therefore, your consideration of Count 1 should concern the second and third and fourth elements of the offense charged. That is, whether the defendant willfully caused the proof of claim to be filed on behalf of Hadar or whether the proof of claim was false, whether the defendant knew the claim was false, and acted with fraudulent intent.

To assist you in this determination, let me now instruct you in the bankruptcy law applicable to this count.

A proof of claim filed in a bankruptcy proceedings is a legal document submitted to the Court by a creditor of the person or corporation who filed bankruptcy.

In this document the creditor is required to notify the Court, the debtor, and all other creditors that he's asserting some claim or right to payment from the estate of the debtor in bankruptcy.

This claim or right to payment can be asserted by a creditor whether or not this right or claim is reduced to judgment, is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

In other words, the creditor can submit a claim whether or not he knows the exact amount, whether it is right, or even if the claim is in dispute, as long as he submits the claim in good faith.

In addition, this proof of claim must be filed with the Bankruptcy Court within a specified time period after the creditor receives notice from the debtor or the claim may be barred by the Bankruptcy Court.

A proof of claim is false if it is untrue when it's made known to be untrue by the person making it or willfully causing it to be made. A proof of claim is not false merely because it may be inaccurate or erroneous in any or all respects. The claim may be asserted by a creditor in good faith even though the moneys being sought are thereafter successfully disputed by the debtor or disallowed by the Bankruptcy Court.

Instead, a proof of claim is false if the statements contained therein are intentionally inaccurate and submitted without any good faith basis for the claim and are not the result of some mistake or clerical error or inadvertent omission.

The Government has alleged that the Hadar proof of claim was false in three particular respects. It's not necessary that the government prove falsity with regard to each of these three grounds. The government has the burden of proving falsity if it proves beyond a reasonable doubt that the proof of claim is false on one of the three grounds charged. However, you may not find the defendant guilty unless you all agree unanimously that the claim is false in one particular respect charged if any at all. It is not enough that you all believe that the claim is false in some manner. That is, you cannot for example find Mr. Overmyer guilty if some of you think the $400,000 deposit charge on the monthly lease payments on the new transmitter is false and the rest of you think that only the $249,000 charge for installation of the transmitter is false.

There must be at least one specific aspect of the proof of claim that all of you believe beyond a reasonable doubt is false before you may find that the proof of claim was a false claim.

Good faith is an absolute defense to the charges in this count. With respect to the count in the indictment charging the defendant filed a, willfully caused to be filed a, false proof of claim, you are instructed that such a claim even if erroneous, made with a good faith belief in its accuracy, does not amount to a false proof of claim and is not a crime.

Again, the burden of establishing criminal intent rests upon the prosecution. The defendant is under no burden to prove his good faith. Rather, the prosecution must prove knowledge of falsity beyond a reasonable doubt.

With respect to this count, you are instructed that the falsity of the claim is not established merely by evidence that shows the proof of claim to be inaccurate in any or all respects.

The criminal law does not penalize mere inaccuracies or mistakes. Therefore, the proof of claim to be criminally false, it must be knowingly and intentionally false.

Thus, if you find beyond a reasonable doubt that the proof of claim filed on behalf of Hadar was inaccurate, you

must also consider whether or not that claim was intentionally false, made with fraudulent intent, or the result of an honest mistake or omission.

\* \* \* \* \* \*

## THE DECISION BELOW

Following fifteen hours of deliberation and based on these instructions, the evidence presented, and its assessment of the credibility of the witnesses, the jury found Overmyer guilty only on Count One, filing a false bankruptcy claim.

On April 22, 1987, the district court granted Overmyer's motion for judgment of acquittal brought pursuant to F.R.Crim. P. 29(c). In overturning the jury's verdict, the court reasoned that the government had, at best, established that Overmyer filed a proof of claim subject to dispute.

Regarding the $50,000 per month lease payments beginning in January, 1981, on the transmitter and antenna, the district court found that "Telecasting had actual possession of the transmitter equipment pursuant to a lease agreement with Hadar and that Hundred East began invoicing Hadar in January." The court reasoned:

> The fact that the lease agreement contained a provision stating rental payments would not commence until installation had been completed does not operate as some type of legal bar to the filing of a proof of claim as was done in this instance. Nor does the lease term preclude the lessee from making payments to the lessor of more monies than the lease itself required or before the payments are due.

Regarding the second specification of falsity in Count One, that the $249,116.18 sum contained in the proof of claim contained charges for installation not incurred as of February 6, 1981, the district court also found that a reasonable jury considering the evidence and instructions of the court, could not find the proof of claim false in this respect, but only that a clerical error had been made. The court held:

> [t]he single fact that the [$44,000 Hood Electric] charge was included in the Hadar claim as an *installation* expense for

the Hundred East equipment does not amount to a material falsehood. The undisputed evidence is that Hadar was billed by Hood for the generators and thereafter charged Telecasting. Thus, the mere listing of the invoice under the wrong heading does not constitute sufficient evidence for the jury to find the claim was false. However, the evidence before the jury also revealed that Telecasting had previously been billed by Hadar for the lease of Hood generators. Hence, the proof of claim presented a double-billing or charge by Hadar for the generators.

The district court also found that the government had not met its burden in establishing the third specification of falsity in Count One, namely that as of February 6, 1981, Telecasting had overpaid Hadar for its leasing obligations. The district court reasoned that the evidence showing that the lease amounts were excessive or that the leases on the equipment which were rewritten upon expiration for equipment no longer of value was irrelevant for a finding of fraud. Further, the district court noted that the evidence on this claim was mainly presented by Klein, who did not consider the One Hundred East Corporation equipment in his calculations. Again, the court ruled that the jury did not have sufficient evidence to find that Overmyer had intended to deceive the bankruptcy court, especially since many of the leases were entered into several years prior to Telecasting's bankruptcy.

## DISCUSSION

As stated by the district court in its April 22, 1987, Order at p. 20, "... criminal sanctions exist to assure that the information utilized in validating or rejecting a claim is credible information." After a thorough review of the evidence before the jury, this court can now only conclude that contrary to the finding of the trial judge, the jury had sufficient evidence before it from which it could reasonably conclude that Overmyer's actions were intended to deceive the bankruptcy court.

In his original motion for judgment of acquittal on Count One pursuant to F.R. Crim.P. 29(c), Overmyer did not dispute that there was sufficient information for a jury to conclude that he in fact controlled Hadar and Telecasting. This does not mean that any evidence presented which implies that at one time Overmyer tried to hide this relationship is irrelevant. Instead, it is probative of Overmyer's intent and knowledge at the time the bankruptcy proceedings were pending.

In general, the jury knew that Telecasting filed a bankruptcy petition in New York in 1976 which was dismissed by the bankruptcy court in 1980. That dismissal was appealed. On February 6, 1981, the day that the appeal was denied, Telecasting filed a bankruptcy petition in Cleveland, Ohio. On March 29, 1981, the bankruptcy court awarded control of Telecasting to the FNBB. Hadar filed a petition under Chapter 11 on March 31, 1981, in New York which petition was transferred to Cleveland by the bankruptcy court.

The jury also heard Overmyer's deposition statement taken on December 2, 1980, in which he denied having any relationship with Hadar, other than leasing automobiles from Hadar, and in which he denied knowing any employees of Hadar. The jury heard Overmyer's statement under oath made at the meeting of creditors in relation to the bankruptcy proceedings at issue in which he testified that the One Hundred East Corporation equipment was installed and would be operational in a month or two, and that the $400,000 "was paid for the purpose of procuring a very favorable lease to the station." While Overmyer admitted that Hadar was owned and trusted to Overmyer's children, he claimed to be unaware of Hadar's board of directors and unsure as to its officers. He also claimed that the $50,000 monthly lease figure on the One Hundred East Corporation equipment was negotiated at arms-length between himself on behalf of Telecasting and Raible on behalf of Hadar.

I. *There was sufficient evidence produced at trial from which the jury could have found that the bankruptcy claim contained a charge of $50,000 per month beginning January, 1981, for lease payments on equipment not yet installed.*

The lease between Telecasting and Hadar provided that payment was to commence when the equipment was "installed." Although One Hundred East Corporation's payment to Hadar began in January, this is irrelevant. If Hadar and Telecasting had been nonrelated entities, Hadar would not have been able to accelerate the payment due date. Because Overmyer was kept apprised on a daily basis of *all* of the functions of Hadar and Telecasting, the jury could infer that he knew the equipment was not yet installed or operational. This is substantiated by Overmyer's own testimony at the creditor's meeting where he acknowledged that he knew the equipment was not operational or completely installed. Also, Overmyer failed to mention the fact that the contractors had walked off the job in 1980 and ceased all installation work because they had not been paid. That the station under FNBB eventually completed installation in 1983 is irrelevant. While Bowe testified that as of February 3, 1981, the antenna and 80% of the transmitter had been installed, the outside plumbing, electrical work and the vapor and cooling systems had not been completed. As of March 13, 1981, none of the electrical connection work had been completed. Shock, Telecasting's president, explained that as of February, 1981, the transmitter was "totally inoperational."

Moreover, there were numerous discussions between Raible and Overmyer regarding the fact that leases needed to be increased to cover sums already taken out of Telecasting and transferred to Hadar. From 1977 to 1983, Raible had several discussions with Overmyer regarding the balance owing between Hadar and Telecasting. At Overmyer's insistence, the leases were increased in value to account for additional monies that had been transferred from Telecasting to Hadar. Raible and Overmyer discussed the means by which the leases would be calculated or recalculated and the movement of additional equipment to the television station to pro-

cure and generate additional lease revenue for Hadar to account for money previously taken from Telecasting.

Per Overmyer's instructions, Raible sent a letter dated April 6, 1978, to Telecasting which changed the leases then in effect from leases for specific terms to month-to-month leases. The monthly rental rate was raised by $4,200, effective as of February 1, 1977. Raible was then instructed to prepare invoices to reflect the additional monthly charge and to re-do the invoices which had previously been submitted to Telecasting.

Overmyer's explanation of this change to Raible was that "a company in bankruptcy such as Telecasting could not expect to get a long-term lease from anyone and Hadar was not going to give them anything more than they would get from anyone else; and it necessitated a short-term month-to-month lease because that was all they could sustain through a Chapter 11 proceeding." With respect to the $4,200 increase, Overmyer explained that $4,200 multiplied by whatever months were involved would produce additional revenue for Hadar and that Hadar needed to cover monies that had already been paid by Telecasting to Hadar.

The $50,000 lease payment itself is questionable. The $50,000 figure was arrived at in approximately March, 1981, but dated as a resolution of January 5, 1981. At Overmyer's direction, the board members as of January, 1981, signed the resolution so that it would look like the decision to pay $50,000 was arrived at in January. The board in January did not include the same individuals as it did in March, 1981, and nothing suggests the January board members had any authority to act after they were off the board!

The above resolution called for $50,000 monthly equipment rental on the One Hundred East Corporation equipment effective as of January 1, 1981. The resolution was signed by Overmyer, Shirley C. Overmyer, Raible and William Chi.

Contracts were signed between Hadar and Telecasting on H–1044 and H–1045 with several figures, but ultimately the $50,000 figure was used. This figure does not comport with the "Overmyer Formula." The "Overmyer Formula" would have required a deposit of $960,000 and monthly payments of approximately $96,000. Realizing that these figures were excessive, Overmyer chose the $50,000 figure himself which is less than the "Overmyer Formula."

Contrary to Overmyer representations to Telecasting's creditors, this figure was not negotiated at arms-length. Overmyer thought that Hadar's payments to One Hundred East Corporation were around $40,000 and that Telecasting's payments to Hadar were $50,000. Hadar actually only paid One Hundred East Corporation $31,000.

When viewed in the light most favorable to the government, this evidence was sufficient to support the jury's verdict that the bankruptcy claim contained a charge of $50,000 per month beginning January, 1981, for lease payments on equipment not yet installed.

II. *There was sufficient evidence produced at trial from which the jury could find that the bankruptcy claim contained a charge of $249,116.18 for installation charges for new equipment which had not been installed as of February 6, 1981.*

As already indicated, the contractors stopped work in 1980. No additional work was performed until 1982. In 1981, at a time when no installations were being performed, Overmyer told Shock "to get a handle on the installation costs which could be associated with the transmitter and any other things that he might see upcoming which were even remotely associated with total installation costs." Shock compiled these figures and gave them to Raible.

In May, 1981, Shock received a letter/invoice from Raible dated February 3, 1981, which preceded the Chapter 11 in Cleveland, that listed the installation expenses allegedly incurred by Hadar as of January 31, 1981. Raible stated that the expenses had been incurred upon the specific request and approval of Shock's staff. The total invoice amount was $249,116.18. Hadar

used this letter/invoice to substantiate its proof of claim.

Although the letter/invoice indicated that the expenses had been incurred as of January 1, 1981, and had been approved by Shock's staff, Shock testified that a satellite communication system had not been received and that he was not aware of any approval of these expenses having been given.

Shock explained the specific amount in the February 3, 1981, letter/invoice. The Products Analysis Structural Testing figure included work done on the transmitter, but also included painting a transmitter building and some structural changes to a transmitter building. While this work had been completed, it did not all relate to the transmitter installation. Big B Fence was not completed, Milo Bros. was completed, the charge for George Kountopes was for the painting of a studio tower which had been done in the summer of 1980 and was related to the transmitter. The two Auburndale truck charges related to the transmitter, as did the charges for Stainless and Slates, although the Slates work was not completed. Shock testified that the Hood Electrical charges were totally unrelated to the installation of the transmitter, antenna or satellite systems installation, although it was for installation of generators at the transmitter site.

Thus, Shock's testimony made clear that some of the work included in the letter/invoice under "work completed" was not only unrelated to the installation costs associated with the transmitter, but also was incomplete.

Regarding the twelve items which accounted for $106,904.14 under "installation in progress," Shock testified that no work had been completed or even started on any of these items. While bids in these amounts may have been received, there were no contractual obligations for this work.

Raible's testimony substantiated Shock's. In late 1980 to early 1981, Overmyer gave Raible a specific dollar amount needed to cover and was told to contact Shock. Overmyer instructed Raible to accumulate all of the costs that would be necessary to complete the installation. Overmyer told Raible to do so to enable Hadar to file a substantial proof of claim in the Telecasting bankruptcy proceeding in order to support funds which he knew had already been removed from the television station. After Raible obtained the information from Shock, he delivered it to Connery. Raible signed this letter at Overmyer's direction.

Raible explained that some of the installation figures included in the proof of claim were based on incurred charges, but in other cases were based only on bids. Raible stated that the $44,000 Hood electrical charge did not relate to the installation of the transmitter, in fact was actually billed in April, 1978, and was the subject of a lease other than H–1043, H–1044 or H–1045.

Raible on behalf of Hadar invoiced Shock on behalf of Telecasting, for these amounts in May, 1984. Raible dated the invoice February 3, 1981, so that it preceded the bankruptcy, and acknowledged that it was not sent on that date, but rather at a later time.

When viewed in the light most favorable to the government, we conclude that this evidence was sufficient to support the jury's finding that the bankruptcy claim contained a charge of $249,116.18 for installation charges for new equipment which had not been installed as of February 6, 1981.

III. *There was sufficient evidence produced at trial from which the jury could find that the bankruptcy claim contained charges that as of February 6, 1981, Telecasting had overpaid Hadar for any leasing obligations which it might have had with Hadar.*

Unrefuted substantial evidence supports a finding that Hadar had in fact overpaid Telecasting. Klein calculated that as of August 7, 1981, the date of the proof of claim, Telecasting had overpaid Hadar. According to Klein's calculations, Telecasting had paid Hadar $83,000 in excess of invoices as of August 31, 1976. The following year, Telecasting overpaid Hadar by

$174,000 which increased the overpayment to $258,000.[4] In 1978, the overpayment decreased to $208,000. For the fiscal years of 1979 and 1980, Hadar overpaid Telecasting by $165,000 and $101,000 respectively. This increased the overpayment to $473,000 for 1979 and $575,000 for 1980.[5] In 1981, the overpayment decreased by $67,000, leaving a cumulative overpayment of $507,-793.72.[6]

Klein arrived at these figures by examining the books and records of Telecasting and Hadar, and spent between 2,500 and 3,000 hours doing so.

Klein also testified concerning the monies transferred from Hadar to AGG. Klein identified $743,573.44 worth of checks from July 11, 1977, to March, 1981, which were written by Telecasting to Hadar. The same day, or the next day, a check in the exact amount was written to AGG under the guise of service agreements.

Also, Meisner, Telecasting's accountant, was called to work by Overmyer on February 28, 1981, to make certain entries in Telecasting's books. This occurred one day after Meisner terminated his employment with Telecasting.

Through these entries, Meisner cancelled a $626,003.47 credit which Hadar owed to Telecasting. The credit was posted to lease accounts and deposit so that it appeared as though Hadar owed no money to Telecasting and that the credit was used to pay the $400,000 deposit and lease payments. The transaction cancelled the $626,000 overpayment by crediting $234,-160 to deposit, that being six months at $39,390.52, and $391,865 to installation costs. Later when the decision was made to charge $50,000 per month, Meisner was asked by Connery to again change the books to reflect eight months at $50,000 for deposit and only $249,000 for installation.

According to Lynch, Hadar's accountant, Hadar owed Telecasting $376,835.04 as of September 1, 1979. Yet, the proof of claim filed in Telecasting's bankruptcy began with a zero balance as of September 1, 1979.

Finally, Raible was aware that Telecasting had overpaid Hadar with respect to the leases and testified that the $400,000 deposit was not the result of arms-length negotiations on Hadar's behalf with Overmyer.

The jury was made aware of Overmyer's involvement and participation in the daily business affairs of both Hadar and Telecasting. Thus, the jury could reasonably charge Overmyer with having the same knowledge of Telecasting's overpayment to Hadar. Nothing was done without Overmyer's permission, and the events which transpired to substantiate Hadar's proof of claim were done at Overmyer's insistence.

Viewed in the light most favorable to the government, this evidence was more than sufficient to support the jury's verdict that, as of February 6, 1981, Telecasting had overpaid Hadar for any leasing obligations which it might have had with Hadar and that Overmyer was not only aware of the overpayment, but orchestrated the whole scheme.

## CONCLUSION

The jurors are to be commended for "seeing through" defendant's elaborate paper chase fraud and certainly had before them sufficient evidence with which to do so. Credibility of the witnesses was for the jury to decide.

For these reasons, the judgment of the district court is reversed and the verdict of the jury reinstated.

---

**4.** See footnote 1, supra.

**5.** See footnote 2, supra.

**6.** See footnote 3, supra.